IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 13, 2020 Session

## IN RE AVAGALINE S.

**Appeal from the Chancery Court for Hawkins County**
**No. 2019-AD-8      Douglas T. Jenkins, Chancellor**

_____

### No. E2020-00222-COA-R3-PT

_____

In this termination of parental rights case, Appellant Mother appeals the trial court's termination of her parental rights to the minor child on the ground of failure to manifest an ability and willingness to parent the child, Tenn. Code Ann. § 36-1-113(g)(14). Similarly, Appellant Father appeals the trial court's termination of his parental rights on the grounds of: (1) abandonment by failure to visit, Tenn. Code Ann. § 36-1-113(g)(1); (2) abandonment by failure to support, Tenn. Code Ann. § 36-1-113(g)(1); and (3) failure to manifest an ability and willingness to parent the child, Tenn. Code Ann. § 36-1-113(g)(14). Appellants also appeal the trial court's finding that termination of their parental rights is in the child's best interest. Because the record does not support grounds for termination of Appellants' parental rights, we reverse the trial court's order concerning same. Accordingly, the issue of whether termination is in the Child's best interest is pretermitted.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

William E. Phillips, II, Rogersville, Tennessee, for the appellant, Joshua S.[1]

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Brittany S.

Jefferson B. Fairchild, Rogersville, Tennessee, for the appellees, Dale S. and Jonna S.

---

[1] In cases involving a minor child, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. Background

Appellant Brittany S. ("Mother") and Appellant Joshua S. ("Father," and together with Mother, "Appellants") are the unmarried biological parents of Avagaline S. (d/o/b June 2011) (the "Child").[2]  Appellee Jonna S. ("Grandmother") and Appellee Dale S. ("Grandfather," and together with Grandmother, "Appellees") are the Child's maternal grandparents.  The Child and Mother lived with Appellees after the Child's birth.  In April 2012, when the Child was approximately 10 months old, Appellees became concerned Mother was abusing illegal drugs.  As a result, they filed an emergency petition for custody and were awarded legal and physical custody of the Child.[3]  Despite the change in custody, Mother continued to live with Appellees and the Child.  Father resided in Tennessee before moving to Oklahoma and Missouri for a brief period of time, ultimately returning to Tennessee around 2015.  Father visited the Child from her birth.  However, in April 2016, Appellees unilaterally decided to deny him any further visitation.  It is undisputed that Father has not visited the Child since April 2016.  However, the parties dispute whether Father financially supported the Child during this time.

On May 5, 2017, Father filed a *pro se* petition for custody of the Child in the Hawkins County Juvenile Court ("juvenile court").  On June 9, 2017, the petition was served on Appellees.  On June 19, 2017, Appellees filed a petition to terminate Appellants' parental rights and for adoption ("original petition") in the Hawkins County Chancery Court ("trial court"), effectively staying Father's custody proceeding.  By order of June 26, 2017, the juvenile court transferred Father's custody matter to the trial court.  On July 11, 2017, Father filed his answer to the original petition.  If Mother filed an answer to the original petition, it is not within our record.

During this time, Mother continued to live with Appellees and the Child.  However, in January 2018, Mother moved in with Father.  Thereafter, in May 2018, Mother gave birth to Appellants' second child, Alexander S., who is not a subject of this appeal.  Mother and Father continue to live together with Alexander.

On September 13, 2018, for reasons not found in the record, Appellees voluntarily nonsuited the original petition.  However, on February 13, 2019, Appellees filed another petition to terminate Appellants' parental rights and for adoption on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to support; and (3) failure to manifest an ability and willingness to assume custody.  Appellees also alleged that

---

[2] We note that the Child's birth certificate shows her name is spelled "Avangaline," and this is also how Father spelled it in his petition for custody of the Child.  However, because the parties have spelled her name "Avagaline" throughout litigation, we adopt this spelling in our opinion.

[3] Absent from our record is any order awarding custody of the Child to Appellees.  However, it appears undisputed that Appellees have retained custody of the Child since this time.

termination of Appellants' parental rights was in the Child's best interest. A guardian ad litem ("GAL") was appointed for the Child, and counsel was appointed to represent Mother. Father retained his own counsel. On June 6, 2019, Father filed his amended answer in which he asserted his affirmative defenses that any failure on his part to visit or support the Child was not willful. Similarly, on December 16, 2019, Mother filed her answer and asserted the same affirmative defenses.

The trial court heard Appellees' petition on December 17, 2019. All four parties testified at trial, and the following were admitted into evidence: (1) Appellees' marriage certificate and the Child's birth certificate and social security card; (2) three juvenile court orders from 2013; (3) Father's May 5, 2017 juvenile court petition; (4) certified letter receipts with Grandmother's signature; (5) a copy of the juvenile court file from Father's custody matter; (6) Walmart money transfer receipts; (7) photographs of Mother and the Child; (8) carbon copies of Father's checks to Appellees; and (9) Father's empty checkbook with deposit slips.

On January 13, 2020, the trial court issued its oral ruling, which it incorporated into its written order of February 4, 2020. The trial court found clear and convincing evidence to terminate Father's parental rights on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to support; and (3) failure to manifest an ability and willingness to assume custody. The trial court also found clear and convincing evidence to terminate Mother's parental rights on the ground of failure to manifest an ability and willingness to assume custody.[4] Finally, the trial court found, by clear and convincing evidence, that termination of Appellants' parental rights is in the Child's best interest. Mother and Father appeal.

## II. Issues

We state the dispositive issues as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate each Appellant's respective parental rights.

2. Whether termination of Appellants' respective parental rights is in the Child's best interest.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

---

[4] The trial court did not find clear and convincing evidence to terminate Mother's parental rights on the grounds of abandonment by failure to visit or support.

- 3 -

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E*., 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E*., 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B*., 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H*., 483

S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

## IV. Grounds for Termination

### A. Abandonment by Father

The trial court found, by clear and convincing evidence, that Father's parental rights should be terminated on the ground of abandonment by failure to visit and failure to support. We begin our analysis with a discussion of the ground of abandonment generally. In pertinent part, Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1). As is relevant to Father, Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to

- 5 -

make reasonable payments toward the support of the child;

***

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

Tenn. Code Ann. § 36-1-102(1)(A)(i), (1)(D), (1)(E).

Prior to 2018, the statutory definition of abandonment placed the burden of proof on the petitioner to show that the parent's failure to visit or failure to support was "willful." However, in 2018, the General Assembly amended the statute to shift the burden of proof to the parent or guardian to show that his or her failure to support or visit was not willful. For cases filed on or after July 1, 2018, Tennessee Code Annotated section 36-1-102(1)(I) now provides that:

For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure . . . .

Tenn. Code Ann. § 36-1-102(1)(I). Here, Appellees filed their petition on February 13, 2019; accordingly, Father had the burden to prove, by a preponderance of the evidence, that his failure to visit or support the Child was not willful.

Concerning willfulness in the context of abandonment for termination of parental rights purposes, this Court has stated:

In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. Aug. 25, 2005) (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *In re Adoption of Angela E*., 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re A.M.H*., 215 S.W.3d at 810). As previously discussed, this Court reviews questions of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H*., 483 S.W.3d at 523-24. We review questions of law *de novo* with no presumption of correctness. *In re Adoption of Angela E*., 402 S.W.3d at 640 (citing *In re A.M.H*., 215 S.W.3d at 810). With the foregoing in mind, we turn to address whether Father abandoned the Child.

### 1. Failure to Visit

It is undisputed that Father did not visit the Child during the four months preceding the filing of the termination petition. Therefore, Father had the burden at trial of proving, by a preponderance of the evidence, that his failure to visit was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). Concerning willfulness, Father alleged two defenses: (1) Appellees prevented him from visiting the Child; and (2) despite Appellees' efforts, Father continued to pursue custody of the Child through his petition in the juvenile court. We address each defense in turn.

The trial court failed to make any findings concerning Father's first defense that Appellees thwarted his visits with the Child. After an extensive review of the record, we conclude that Father proved, by a preponderance of the evidence, that Appellees not only prevented him from visiting the Child, but also attempted to wholly remove Father from the Child's life.

Turning to the record, it is clear that Appellees tried to eliminate Father from the Child's life. Father visited the Child and was developing a relationship with her until April

2016. Around this time, Father visited the Child in Appellees' home where he stayed for a week-long visit. At trial, Grandmother admitted that there were no problems with Father's week-long visitation as it concerned the Child; however, Grandmother and Grandfather believed Father stole from them during this visit (Father denied this), which prompted Appellees to forbid Father from entering their property. Grandmother admitted that Father is not allowed in her home "because he stole from [them] . . . [but that] it has nothing to do with . . . [the Child]."

Despite Grandmother's concession that there were no problems concerning Father's visit with the Child, after said visit, Appellees prohibited Father from seeing the Child. Father testified that, soon after this visit, he contacted Appellees and was told that Appellees would file harassment charges against him if he ever contacted them again. Mother testified that she stopped asking Appellees if Father could visit the Child because it was understood that he was not permitted any visitation. Appellees not only forbade Father from in-person visitation, but also from speaking with the Child on the telephone. Father testified to a recent incident where Mother was video chatting with the Child when the camera lens switched around to where the Child could see Father on the screen. Grandmother saw Father on the screen and immediately ended the call. Grandmother testified that she took the phone away from the Child and ended the call because "[the Child] didn't know who she was talking to."[5] Father is prevented from not only speaking with the Child on the telephone, but from even *listening* to the Child's telephone calls with Mother. Mother testified that, if Grandmother hears Mother speaking with the Child on speakerphone, Grandmother will order Mother to take the telephone off speaker "because [Father]'s not allowed to hear [the Child]," a demand that is certainly most cruel. In addition to limiting any interaction between Father and the Child, Appellees have also prevented the Child from knowing anything about her father. According to Mother, she is prohibited from mentioning Father's name in Appellees' or the Child's presence. Mother is also forbidden from referring to Father as the Child's or Alexander's father, and she has resorted to calling him her "roommate."

Remarkably, Appellees have independently removed Father from the Child's life, absent any court order according them such power. At trial, Appellees relied on 2013 juvenile court orders for their authority to unilaterally remove Father's visitation. The three juvenile court orders, dated April 30, 2013, May 16, 2013, and November 14, 2013, were entered into evidence at trial.[6] The orders addressed only Father's visitation with the Child. One of the orders required Father to undergo an Alcohol and Drug Assessment; and two of the orders required Father to submit to a hair follicle test. The final order provided that Father's parents would supervise his visitation with the Child. At trial, both Appellees

---

[5] Contrary to Grandmother's testimony, the record demonstrates that the Child does indeed know who Father is and that he is her father.

[6] It appears these orders stem from the emergency petition Appellees filed in 2012. The orders are not related to Father's custody petition in the juvenile court.

testified that they would have allowed Father to visit had he complied with court orders and obtained a drug test.

The problem with Appellees' reliance on these orders is two-fold. First, there are potential due process issues with the orders. There is no proof that Father was even a party to the underlying custody proceeding from which the orders originated. Indeed, Father testified at trial that he was living in Missouri at the time the orders were entered. Similarly, there is no proof that Father ever received notice of the orders as none of the orders contain a certificate of service. Father's testimony at trial demonstrated that he was unaware of his responsibilities under the orders. When asked if he submitted to an Alcohol and Drug Assessment, Father's response was: "When was I ordered to take an Alcohol and Drug Assessment?"

Assuming, *arguendo*, that Father received notice of the 2013 orders, the orders still did not grant Appellees the right, without court approval, to unilaterally halt Father's visitation. *See generally* **In re Justin P.**, No. M2017-01544-COA-R3-PT, 2018 WL 2261187, at *4 (Tenn. Ct. App. May 17, 2018) (explaining that the trial court erred when it found that the parties' parenting plan gave the father the right to curtail the mother's visitation without court approval). Importantly, the November 14, 2013 order specifically provided, in pertinent part, that the "[c]ourt reserve[d] the ruling on suspending visitation with [Father] at this time." There is simply nothing in the record to establish Appellees' authority to end Father's visits with the Child. *See* **Id.** at *5. Yet, Appellees independently terminated, not only Father's visitation with the Child, but any form of communication with her.

Finally, we note that Appellees' reliance at trial on the 2013 orders is contradicted by their own actions. The record shows that Father continued to see the Child after the 2013 orders were entered, presumably without completing the requirements in the orders. Therefore, it appears that Appellees rely on the 2013 orders only when it benefits them, i.e. when they want to terminate: (1) Father's visitation with the Child; and (2) his parental rights based on his failure to visit. Appellees use their legal status as the Child's custodians as both a shield, preventing them from allowing Father visitation with the Child, and as a sword, to demonstrate a ground for termination of his parental rights due to his lack of visitation. *See* **In re Braelyn S.**, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *8 (Tenn. Ct. App. July 22, 2020).

However, "Tennessee law makes clear that a [custodian] cannot significantly interfere with the noncustodial parent's visitation and still rely on the ground of failure to visit to terminate parental rights." **In re Braelyn S.**, 2020 WL 4200088, at *8 (citing **In re S.M.**, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004)). Indeed, time and again Tennessee courts have held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." **In re A.M.H.**, 215 S.W.3d at 810 (citing **In re Swanson**, 2

- 9 -

S.W.3d 180, 189 (Tenn. 1999)); *In re Braelyn S.*, 2020 WL 4200088, at \*8; *In re Justin P.*, 2018 WL 2261187, at \*6; *In re Adoption of T.Z.T.*, No. M2007-00273-COA-R3-PT, 2007 WL 3444716, at \*5 (Tenn. Ct. App. Nov. 15, 2007).  This is because a "parent's efforts to support or develop a relationship with a child" are significantly restrained when another individual blocks access to the child or "vigorously resist[s] a parent's efforts to visit the child. . . ."  *In re S.M.*, 149 S.W.3d at 642 n.18. (internal citations omitted); *see also **In re Braelyn S.***, 2020 WL 4200088, at \*8; *In re Justin P.*, 2018 WL 2261187, at \*4.

Recalling that Father's burden was by a preponderance of the evidence, Tenn. Code Ann. § 36-1-102(1)(I), we conclude that he has proven that it "is more likely true than not true," that his failure to visit was not willful because Appellees blocked his access to the Child.  *In re Braelyn S.*, 2020 WL 4200088, at \*8 (internal citations omitted) ("Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true.").  *See also **In re S.M.***, 149 S.W.3d at 642 n.18 (internal citations omitted); *In re Justin P.*, 2018 WL 2261187, at \*4.  There is ample evidence in the record that the only reason Father stopped asking to visit his Child was because he was threatened with harassment charges, and it was understood that Appellees forbid him from visiting her.  While Appellees rely on the 2013 juvenile court orders as justification for suspending Father's visits, it is apparent that Appellees' contempt for Father was the driving force behind their refusal to allow him to visit the Child.

The record clearly demonstrates that Appellees have a great deal of animosity toward Father.[7]  At trial, Grandmother admitted that she "do[es] not like [Father]," and her disdain for him radiated throughout the pages of her testimony in the trial transcript.[8]  "The Tennessee Supreme Court has held that antagonism between biological parents and legal guardians may excuse a failure to visit."  *In re Justin P.*, 2018 WL 2261187, at \*6 (citing *In re A.M.H.*, 215 S.W.3d at 810 ("Where, as here, the parents' visits with their child have resulted in enmity between the parties . . . the evidence does not support a 'willful failure to visit' as a ground for abandonment.")).  Here, Father's failure to visit the Child is excused because Appellees' behavior "constitute[d] a significant restraint or interference with [his] attempts to visit the [C]hild."  *In re M.L.P.*, 281 S.W.3d at 393 (citing *In re Audrey S.*, 182 S.W.3d at 864).  Thus, we conclude that Father has proven his defense, by a preponderance of the evidence, that Appellees thwarted his visitation with the Child such

---

[7] Such animosity seems one-sided.  At trial, Father testified that he doesn't "necessarily not like [Appellees].  [He's] extremely grateful for what they've done for [his] daughter," but he does not appreciate their blocking his visitation.

[8] During trial, Grandmother made several sarcastic remarks at Father's expense.  For example, in one line of questioning, she was asked if she knew whether Father had ever been charged with a crime, to which she responded: "Only because he hasn't been caught."  When asked why Grandmother rolled her eyes when she indicated that Father is Alexander's biological father, she testified: "Because he keeps knocking up my daughter."  As further proof of Appellees' contempt for Father, the record shows that Appellees would throw away his gifts to the Child if they knew the gifts came from Father.  As a result, Father would give Mother his gifts, which she would pass along to the Child.

that his failure to visit her was not willful. Accordingly, we turn to Father's second defense, i.e., that his failure to visit cannot be willful because he was pursuing custody of the Child in juvenile court before the termination petition was filed.

Appellees' harmful behavior, discussed at length *supra*, motivated Father to file his custody petition. In his own words, Father filed the petition because he was "tired of not being able to see [his] daughter." Despite this evidence, the trial court found that

> . . . [Father] has not visited at all and [Father]'s defense to that is I filed a petition to visit back in '17. But the [c]ourt finds that [Father]'s filing of that is – I think was done in a moment of anger or kind of spur of the moment. He's made no real effort to follow through on it that the [c]ourt can see and it looks to be a bit pretentious on his part. He's not visited, he's not filed anything in court that he actually followed through with sufficient to amount to the defense. And I believe that that ground is sustained by clear and convincing evidence.

There is simply nothing in the record to support the trial court's finding that Father's filing of his custody petition was a "spur of the moment" decision. Equally puzzling is the trial court's statement that Father's petition was "a bit pretentious on his part." There is absolutely no proof that Father's actions were motivated by anything other than his desire to see his Child. Further, the trial court's finding that Father failed to follow through with the petition is also unsupported by the record because Appellees' filing of the termination petitions effectively prevented Father from litigating his custody petition.

Rather than surrender to Appellees' efforts to sever his relationship with the Child, Father proactively sought the juvenile court's assistance in establishing custody. *See **In re Chelbie F.***, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at \*6 (Tenn. Ct. App. Apr. 27, 2007). As discussed, *supra*, on May 5, 2017, Father filed his *pro se* petition for custody with the juvenile court. The record reflects that Appellees received notice of Father's petition on June 9, 2017. Although Grandmother's signature appears on the certified letter receipt for the petition for custody, she denied receiving it. However, Grandfather testified that Appellees received the petition and immediately sought an attorney. The hearing on Father's petition for custody was scheduled for June 29, 2017. However, on June 19, 2017, ten days before the hearing, Appellees filed the original petition to terminate Appellants' parental rights and for adoption.

By statute, the filing of Appellees' petition suspended Father's petition for custody of the Child and transferred the matter from the juvenile court to the trial court. Tenn. Code Ann. § 36-1-116 (f)(2) ("[A]ny proceedings that may be pending seeking the custody . . . of the child or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed . . . shall be suspended pending the court's orders in the adoption proceeding, and jurisdiction of all other pending matters concerning the child . . .

shall be transferred to and assumed by the adoption court."); *see also* Tenn. Code Ann. § 37-1-103 (c) (explaining, in part, that the juvenile court retains jurisdiction over a case filed in its court until a petition for adoption is filed as explained in Tennessee Code Annotated section 36-1-116(f)).  Nevertheless, the trial court found, that Father failed to act on his custody petition.  However, the record shows that Father only had a short period of time in which he *could have* acted.  Appellees' original petition for termination and adoption was pending from June 19, 2017 through September 13, 2018, when Appellees nonsuited it. Five months later, on February 13, 2019, Appellees filed the second petition for termination and adoption, which is the subject of this appeal.  Therefore, the only period of time in which Father *could have* pursued his petition for custody was the five months between Appellees' nonsuit of the original petition and their filing of the second petition.

While Father has been consistently represented by counsel in the termination and adoption proceedings, he filed his petition for custody *pro se* and has never been represented by counsel in that matter.  The record shows that Father misunderstood and was unaware of the procedures to follow in the juvenile court after the nonsuit of the original petition.  Even at trial, Father remained confused regarding the proper procedure and testified that he "didn't understand that [he] had to go back and file another petition for custody."  When it was explained that Father was not required to file another petition, but to ask the juvenile court for a hearing, Father testified that he did not know that was required.  He explained that he thought his petition for custody "would start to go back into effect" once the termination and adoption case ended, and by the time he realized that was not the proper procedure, Appellees had filed their second petition for termination and adoption, which again suspended Father's custody lawsuit.

Father was clearly pursuing a petition to establish custody of the Child before the termination and adoption petitions were filed.  "His pursuit of a judicial remedy is inconsistent with a finding that he willfully failed to . . . visit [the Child] during the four months immediately preceding the filing of the petition."  *In re Chelbie F.*, 2007 WL 1241252, at *6; *see also In re A.M.H.*, 215 S.W.3d at 810 ("[W]here the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment.").  The record shows that the only time in which Father could have actively pursued his petition was the five months between the nonsuit of the original petition and the filing of the second petition for termination and adoption.  We decline to conclude that Father's failure to pursue the custody petition during this five-month period constituted his willful abandonment of the Child.  *Cf. In re Adoption of Angela E.*, 402 S.W.3d at 638-39; 642 (concluding that the father willfully failed to visit his children when he filed a petition to reinstate his visitation rights in July 2003 but never acted on it before the mother filed a termination petition in July 2005).  It appears Father was simply unaware that he was required to approach the juvenile court concerning another hearing on his custody petition.  Accordingly, we conclude that Father has proven his defense, by a preponderance of the evidence, that his failure to visit the Child was not willful as shown by his pursuit of custody during the

relevant time period. Because Father met his burden to show his failure to visit was not willful, we reverse the trial court's termination of Father's parental rights on the ground of abandonment by failure to visit, and we turn to the question of whether Father abandoned the Child by failing to support her.

## 2. Failure to Support

The trial court found that Father abandoned the Child by failing to support her in the four months preceding the filing of Appellees' second termination petition, to-wit:

> With respect to failure to support, [Father] shows a checkbook where he claims that he wrote out a bunch of checks—he wrote out the checks every so often and sent them over to [Appellees]. [Appellees] denied ever receiving them and [Father] agreed that they never went to the bank. [Father] agrees that he was certainly able to support the [C]hild but his efforts to support this [c]ourt does not find are entirely credible, do not amount to the defense in the [c]ourt's mind because this [c]ourt can't find that it was actually proven. So the [c]ourt sustains the uncontested part of the ground, which is that he did not support. The [c]ourt believes by clear and convincing evidence that it's willful because his defense is not in the [c]ourt's mind entirely credible.

Contrary to the trial court's finding that it is uncontested that Father failed to support the Child, Father, on appeal, "asserts unequivocally that he did pay support to [Appellees]." Citing **In re M.J.B.**, Father alleges that he "has not voluntarily and intentionally chosen not to provide financial support for his daughter." 140 S.W.3d at 654 ("Terminating parental rights based on failure to support presupposes (1) that the parent is aware of his or her duty to support, (2) that the parent is able to provide financial support, either through income from private employment or qualification for government benefits, and (3) that the parent has voluntarily and intentionally chosen not to provide financial support without a justifiable excuse.").

The record substantiates Father's argument. After April 2016, when Appellees severed Father's contact with the Child, he attempted to support his daughter, but Appellees again thwarted his efforts. At trial, Father testified that he "tried to send money to [Grandmother] . . . and was told that she didn't want [his] money . . . so [he] sent it to [Mother] instead" because Mother was living with Appellees and the Child at the time. Mother corroborated Father's testimony when she testified that Appellees informed her they would not accept support from Father because Appellees believed doing so would entitle Father to visitation, and they did not want him to have visitation with the Child. The record confirms Father's testimony that he sent support to Mother when Grandmother rebuffed his attempt. Both Mother and Father testified that, from 2016 through January 2018, Father sent Mother weekly Walmart-to-Walmart money transfers with the

understanding that such funds would go toward supporting the Child. The receipts for these transfers were entered as an exhibit at trial.

Father also testified that, after Appellees dismissed the original termination petition in September 2018, on the advice of counsel, he began writing and mailing weekly checks to Appellees as support payments for the Child, but these checks never cleared his account. Father admitted carbon copies of the checks as an exhibit at trial; the first check is dated October 12, 2018, and the checks continue through the filing of Appellees' second petition for termination. Father testified that he kept the carbon copies of the checks, as well as the receipts from the Walmart money transfers, to show that he was trying to support the Child, but Appellees would not let him.

Appellees' only proof that Father failed to support the Child was their testimony that they never received support from Father, a claim that is most disingenuous. Rather, the proper statement would be that Appellees never *accepted* Father's support because they feared doing so would result in his visitation with the Child. The record shows that Father tendered support; if such payments failed to reach the Child, it was due to Appellees' actions, not Father's. Appellees cannot now rely on their misbehavior as justification for terminating Father's parental rights. Just as a custodial parent "cannot significantly interfere with [a] noncustodial parent's visitation and still rely on the ground of failure to visit to terminate parental rights," *In re Braelyn S.*, 2020 WL 4200088, at *8, neither can a custodial parent significantly interfere with a noncustodial parent's support and still rely on the ground of failure to support to terminate parental rights. *See In re S.M.*, 149 S.W.3d at 642 n.18; *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5.

Upon extensive review of the record, we conclude that the evidence preponderates against the trial court's finding that Father failed to support the Child. *See In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re A.M.H.*, 215 S.W.3d at 810); Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24. Father's and Mother's testimony, along with the Walmart transfer receipts and the carbon copies of Father's checks, which he wrote and mailed during the four months preceding the filing of the termination petition, demonstrate Father's financial support of the Child. We cannot fault Father for Appellees' actions upon receipt of said support.

Even assuming, *arguendo*, that Father failed to support the Child, for all the reasons discussed, *supra*, Father proved, by a preponderance of the evidence, that his failure was not willful because Appellees thwarted his attempts. Further, Father's petition for custody of the Child also serves as proof that his failure to support her was not willful. As discussed, *supra*, the Tennessee Supreme Court concluded it was inconsistent to find that biological parents willfully failed to visit their child when the parents redirected their "efforts at maintaining a parent-child relationship" to the courts. *In re A.M.H.*, 215 S.W.3d at 810. This Court has applied the same logic to a parent's failure to support a child, to-

- 14 -

wit: "Based on our reasoning of the Tennessee Supreme Court's decision in *In re [A.M.H.]*, we have no reason to conclude that the same principle should not be applied to willful failure to support claims when a party is actively seeking to establish a child support payment." *In re Chelbie F.*, 2007 WL 1241252, at *6 (citing *In re A.M.H.*, 215 S.W.3d at 810). Father implicitly sought financial responsibility of the Child through his petition for custody. Therefore, based on the foregoing, the trial court should have inferred from Father's actions and conduct, that he intended to support the Child, and that any failure to do so was not willful on his part. *See In re Audrey S.*, 182 S.W.3d at 864 ("The willfulness of particular conduct depends upon the actor's intent, [which] is seldom capable of direct proof . . . . Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct."). Because any failure on Father's part to support the Child was not willful, we reverse the trial court's termination of his parental rights on the ground of abandonment by failure to support.

### B. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court terminated both Appellants' parental rights under Tennessee Code Annotated section 36-1-113(g)(14), which provides for termination when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground required Appellees to establish two separate elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). First, that Mother or Father "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).[9] Second, that placing the Child in Mother's or Father's legal and physical custody would "pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." *Id.*

---

[9] This Court is split over the proper interpretation of the first prong of Tennessee Code Annotated Section 36-1-113(g)(14). *See In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11. (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's conflicting views on the first prong of the statute). The split concerns whether a parent must fail to manifest both an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest either an ability or willingness to assume custody or financial responsibility. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) with *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). By order of June 15, 2020, the Tennessee Supreme Court certified two questions for review on this issue of statutory interpretation involving the first prong of Tennessee Code Annotated section 36-1-113(g)(14). *See In re Nevaeh M.*, M2019-00313-SC-R11-PT.

Here, the trial court found, by clear and convincing evidence, that both Appellants failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child. Concerning Father, the trial court found that he "has no relationship with the Child" and "has not manifested a sustained effort to assume legal or physical custody of the [C]hild, or financial responsibility." For the plethora of reasons discussed, *supra*, if Father has no relationship with the Child, it is because of Appellees' actions. Appellees' efforts thwarting, not only Father's bond with the Child, but also his attempts to visit and support her, cannot form the basis on which to terminate his parental rights. Concerning Mother, the trial court found that she "admitted everything that's required to prove" this ground, "that she's not really to a place where she can take the [C]hild back immediately," and that "[s]he just doesn't have the ability to personally assume legal and physical custody or financial responsibility of the [C]hild" because "[s]he can barely take care of herself."

The record simply does not support the trial court's findings. Rather, Mother and Father testified that they are willing and able to receive custody of the Child. The record demonstrates that the parents have been working together, as one family unit, to provide for their son, Alexander. There can be no greater proof of the parents' ability to care and provide for the Child than their continued care for Alexander. Alexander was born in May 2018, and he has remained in the custody and care of Mother and Father.[10] Father testified that he has a stable job, which he had maintained for four years at the time of trial, that allows him to provide for the family financially. Mother testified that she serves as Alexander's full-time caretaker.

In Mother's own words, Appellants have "finally got[ten] on [their] feet." Indeed, Mother admitted at trial that, in April 2012, the Child "needed" to be taken away from her. Rather than shy away from her past issues with drug abuse, Mother acknowledged that the Child was not safe in her care when Appellees received custody. However, Mother testified that she no longer abuses drugs (and has not done so for a few years) and now has the ability to care for the Child, as she has cared for Alexander. Similarly, Father testified that he neither drinks alcohol nor takes drugs, and that he has "done everything . . . [he] can do [to get his] family back together." Appellees failed to provide any proof to the contrary. By Grandfather's own admission at trial, Appellees have no proof that Alexander is in danger or that the parents fail to provide for him. As evidence that Appellants desire to care and provide for both Alexander and the Child, Appellants testified that they signed a lease and have purchased furniture for a three-bedroom house with the hopes that they would one day receive custody of the Child.

The parents' ability to continuously care for Alexander, without issue, demonstrates

---

[10] Mother testified that the Department of Children's Services has never investigated her concerning Alexander. Further, Appellees testified that they have not attempted to obtain custody of Alexander.

their ability to care for the Child. Further, Appellants' leasing and furnishing a three-bedroom house shows that they have undertaken steps to bring the Child into their home, demonstrating their willingness to assume custody of her.[11] *See* **In re Jonathan M.**, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) ("When evaluating willingness, we look for more than mere words."). Therefore, we conclude the trial court erred when it found that Appellants failed to manifest an ability or willingness to assume legal and physical custody or financial responsibility of the Child.

For completeness, we turn to the second prong of analysis, whether placing the Child in Appellants' care "would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." Tenn. Code Ann. § 36-1-113(g)(14). Concerning what constitutes "substantial harm," we have explained before that

> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

**In re Maya R.**, 2018 WL 1629930, at *8 (quoting **Ray v. Ray**, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). The only evidence Appellees presented regarding this issue, was Grandmother's testimony that she believed the Child would be at risk of physical or psychological harm if placed with Mother and Father because "[the Child] would be uprooted from the only home that she has lived in." The trial court relied on Grandmother's testimony, as well as testimony from Mother and Father, when it found that placing the Child in Appellants' legal and physical custody would pose a risk of substantial harm to the Child. Concerning Mother's testimony, the trial court found that Mother "admitted that 'ripping the [C]hild away' from [Appellees] would cause substantial harm . . . to the [C]hild." Similarly, the trial court found that Father testified that "taking [the Child] away from her present custodians would traumatize [her] if she were uprooted."

Respectfully, the trial court mischaracterized Appellants' testimony. Both Appellants' acknowledged that *immediately* removing the Child from Appellees' custody would likely be traumatizing to her, as she has lived with Appellees almost her entire life. However, neither parent testified that there would be a risk of substantial harm to the Child if she was placed in their custody. Rather, Appellants testified that they anticipated a gradual transition from Appellees' custody to theirs, so the Child would be able to adjust

---

[11] We note that Father's petition for custody of the Child quite obviously also demonstrates his willingness to assume legal and physical custody or financial responsibility of the Child.

- 17 -

to her new home and caretakers. Mother testified that she wanted to assume custody of the Child, but that she also wanted to "ease [the Child] into that transition." She wanted the Child "to be able to see [Appellants] and be able to get to re-know [Father] again before" fully transitioning her into Appellants' care. Appellants even had the foresight to rent a house that is only three miles from Appellees' house to help with the Child's smooth transition. Mother testified that she chose a home "very close to [her] parents just in case . . . [the Child] spends the night one night and she doesn't feel comfortable . . . she could go right back to [Appellees]." Similarly, Father testified that he did not believe the Child would be traumatized as long as she was gradually transitioned into Appellants' lives. To the contrary, Father believed that it would benefit the Child to be placed in his custody because he is "a willing father" who wants to be part of her life.

Contrary to Grandmother's opinion and the trial court's findings, the record does not support the conclusion that placing the Child in Appellants' custody would pose a risk of substantial harm to her physical or psychological welfare. Rather, the record shows that Appellants would provide the Child with the love and care she deserves. Appellants are loving parents who have worked hard to overcome past obstacles to create a loving and supportive family unit. Both Appellants love and care for Alexander, and desire to welcome the Child into their home to complete their family. Indeed, it is undisputed that Mother and the Child are deeply bonded to one another. Grandmother admitted that removing Mother from the Child's life "would absolutely devastate" the Child. Further, the record shows that the Child is also deeply bonded with her little brother, and both children deserve the chance to grow this relationship. Finally, it is clear that Father desperately wishes to develop a relationship with his daughter, as evidenced by the following testimony: "You don't know how hard it is to have two children and only be able to love one because you can't see the other one." We simply cannot conclude from the evidence in the record that placing the Child in Appellants' custody would pose a risk of substantial harm to her welfare. Indeed, Mother and Father have already placed the Child's welfare above their own desires by suggesting that the Child be slowly transitioned from Appellees' custody to theirs, the sole purpose of which is to ensure that the Child is not harmed or traumatized during the transition. While Appellees admirably stepped in to care for the Child at a time when Appellants could not, the record reflects that Appellants are now able to provide the support and care the Child deserves. Accordingly, we reverse the trial court's termination of both Mother's and Father's parental rights as to this ground.

Because we conclude the trial court erred when it found grounds to terminate Appellants' parental rights, the issue of whether termination is in the Child's best interest is pretermitted.

### V. Conclusion

For the foregoing reasons, we reverse the trial court's order terminating Appellants' parental rights. The case is remanded for such further proceedings as may be necessary

and are consistent with this opinion.  Costs of the appeal are assessed to the Appellees, Dale S. and Jonna S., for all of which execution may issue if necessary.


        _s/ Kenny Armstrong_____
        KENNY ARMSTRONG, JUDGE